Laurence D. King (SBN 206423)
Matthew B. George (SBN 239322)
Blair E. Reed (SBN 316791)
**KAPLAN FOX & KILSHEIMER LLP**
1999 Harrison Street, Suite 1560
Oakland, CA 94612
Telephone: 415-772-4700
lking@kaplanfox.com
mgeorge@kaplanfox.com
breed@kaplanfox.com

Norman E. Siegel*
J. Austin Moore*
Brandi S. Spates*
**STUEVE SIEGEL HANSON LLP**
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Tel: 816-714-7100
siegel@stuevesiegel.com
moore@stuevesiegel.com
spates@stuevesiegel.com
*Pro Hac Vice* Forthcoming

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLAIRE PADDY and NEIL HAVEN, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>23ANDME, INC.,<br><br>Defendant. | Case No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>(1) Negligence<br>(2) Negligence *Per Se*<br>(3) Violation of California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*<br>(4) Breach of Implied Contract<br>(5) Unjust Enrichment<br>(6) Breach of Confidence<br>(7) Declaratory Relief<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Claire Paddy and Neil Haven (collectively, "Plaintiffs"), by and through the undersigned counsel, bring this class action complaint against Defendant 23andMe, Inc. ("Defendant" or "23andMe"), individually and on behalf of all others similarly situated. Plaintiffs make the following allegations based upon personal knowledge as to their own actions and upon information and belief as to all other matters.

## INTRODUCTION

1.      Plaintiffs bring this action on behalf of themselves, and all other individuals similarly situated ("class members") against Defendant for its failure to secure and safeguard the personally identifiable information and protected health information ("PHI") of at least 6.9 million 23andMe customers.

2.      Defendant sells direct-to-consumer genetic testing kits to the public. To use Defendant's services, customers are required to provide a saliva sample that is subjected to a process called single nucleotide polymorphism genotyping. Genotyping looks at specific locations in DNA and identifies variations. Defendant focuses on the variations that are known to be associated with "important health conditions, ancestry and traits."[1]

3.      According to Defendant, it has more than 14 million customers worldwide,[2] and receives and stores "a large volume of personally identifiable information ("PII"), genetic and health information, and other data relating to our customers and patients, as well as other PII/PHI and other data relating to individuals such as our employees."[3]

---

[1] https://www.23andme.com/genetic-science/ (last visited December 29, 2023).

[2] https://medical.23andme.com/ (last visited December 29, 2023).

[3] https://investors.23andme.com/node/8601/html (last visited December 29, 2023).

4.     In early October 2023, hackers posted an initial data sample on the platform BreachForums, including data that was claimed to come from "one million 23andMe users of Jewish Ashkenazi decent and 100,000 23andMe Chinese users."[4]

5.     According to recent reports, the stolen data may have been circulating for at least two months before Defendant alerted the public of the Data Breach. On August 11, 2023, a hacker on a known cybercrime forum called Hydra advertised a set of 23andMe user data. "The hacker claimed to have 300 terabytes of stolen 23andMe user data, and said they contacted 23andMe, 'but instead of taking the matter seriously, they asked irrelevant questions.' The hacker asked for $50 million for the data, and claimed they would only sell it once, but also offered to sell only a subset of data for between $1,000 and $10,000."[5] At least one person saw the Hydra post and alerted user on the "unofficial" 23andMe subreddit that same day.[6]

6.     Defendant waited until October 6, 2023, to publish a notice on its website stating that it was subject of a data breach whereby hackers gained unauthorized access and obtained information from certain accounts, including information about users' DNA Relatives profiles (the "Data Breach"). The hackers were able to access highly sensitive PII/PHI stored on Defendant's servers, including names, sex, birth year, genetic results, profile photos, relationship labels, and geographic location. Thus, for nearly two months, Defendant did nothing in response to the August 11, 2023 Hydra and Reddit posts, leaving Plaintiffs and class members uniformed about the Data Breach.

---

[4] https://techcrunch.com/2023/12/04/23andme-confirms-hackers-stole-ancestry-data-on-6-9-million-users/ (last visited December 29, 2023).

[5] https://techcrunch.com/2023/10/10/hackers-advertised-23andme-stolen-data-two-months-ago/ (last visited December 29, 2023).

[6] *See id.* Subreddits are forums on the social media platform Reddit where people with shared interests can post content, discuss, and share information.

7.     Plaintiffs and class members impacted by the Data Breach are now at serious risk. Their most sensitive personal PII/PHI is in the possession of cybercriminals seeking to profit from it and is available on underground websites for anyone to access.

8.     The Data Breach occurred because Defendant did not require users to implement two-factor authentication, did not double-check whether someone logging in from an unknown IP address is the legitimate user, and offered no protection from brute-force entries—mechanisms by which hackers can try an endless loop of combinations of letters and numbers until they land on the correct password to unlock account. Even though these basic precautions are common and unexceptional security measures across a wealth of online services, Defendant did not utilize them to protect its users' accounts.

9.     As a direct and proximate result of Defendant's failure to implement and maintain reasonable data security measures, Plaintiffs and class members did not receive the benefit of their bargain with 23andMe and now face a significant risk of identity theft and fraud, financial fraud and blackmail, and other identity-related fraud now and into the indefinite future.

## **PARTIES**

10.     Plaintiff Claire Paddy, a resident and citizen of Maryland, was informed that she was a victim of the Data Breach on October 11, 2023.

11.     Plaintiff Neil Haven, a resident and citizen of Massachusetts, was informed that he was a victim of the Data Breach on October 12, 2023.

12.     Defendant 23andMe, Inc. is a Delaware corporation with its headquarters and principal place of business located at 349 Oyster Point Blvd., South San Francisco, California 94080.

## **JURISDICTION AND VENUE**

6.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332, the Class Action Fairness Act, because: (i) there are 100 or more class

members; (ii) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and (iii) there is minimal diversity because members of the Class are citizens of different states from Defendant.

7.      This Court has personal jurisdiction over Defendant because its principal place of business is in the Northern District of California, it operates in this District, and the computer systems implicated in the Data Breach are likely based in this District. Its business operations are in this District, and Defendant intentionally avails itself of the markets within this District such that the exercise of jurisdiction by this Court is just and proper.

8.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendant is headquartered and does substantial business in this district. Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this action occurred in this District. Defendant is based in this District, maintains customer PII/PHI in the District, and has caused harm to Plaintiffs and to class members residing in this District.

## FACTUAL ALLEGATIONS

### *23andMe's Privacy Practices*

9.      23andMe, founded in 2006, holds itself out to the public as "a leading consumer genetics and research company."[7] It describes its mission as helping people "access, understand, and benefit from the human genome."[8] According to the "Corporate Profile" on its website, 23andMe touts itself as having "pioneered direct access to genetic information as the only company with multiple FDA clearness for genetic health reports."[9]

---

[7] https://investors.23andme.com/?_gl=1*18i3yb*_ga*MTM5NzYyNjMxMC4xNzAxOTY0Nzgw*_ga_G330GF3ZFF*MTcwMjQ4MzkxMy45LjEuMTcwMjQ4NDYzMy4wLjAuMA.

[8] *Id.*

[9] *Id.*

10.     As a condition of receiving its services, Defendant requires that its customers, including Plaintiffs and class members, entrust it with sensitive PII/PHII, including their genetic information, which is among the most personal and confidential types of personal data.

11.     Given the amount and sensitive nature of the data it collects, Defendant maintains a "Privacy Statement" and a supplemental "Privacy Notice for U.S. State Residents." Defendant represents, among other things, that customers have a "right to know whether we sell or share your Personal Information…with a third party."[10]

12.     Defendant recognizes that safeguarding the privacy of its customers is a matter of the highest importance: "When you explore your DNA with 23andMe, you entrust us with important personal information. That's why, since day one, protecting your privacy has been our number one priority. We're committed to providing you with a safe place where you can learn about your DNA knowing your privacy is protected."[11]

13.     Defendant understands the importance of protecting customers' genetic information: "Your genetic information deserves the highest level of security, because without security, you can't have privacy. 23andMe employs software, hardware, and physical security measures to protect your data."[12]

14.     Defendant tells its customers to "[r]est assured knowing that . . . We will not share your genetic data with employers, insurance companies, public databases or 3rd party marketers without your explicit consent. . . . We exceed industry data protection standards and have achieved 3 different ISO certifications to demonstrate the strength of our security program . . . We encrypt all sensitive information and conduct regular assessments to identify security vulnerabilities and threats."[13]

---

[10] https://www.23andme.com/legal/us-privacy/ (last visited December 29, 2023).

[11] https://www.23andme.com/privacy/ (last visited December 29, 2023).

[12] *Id.*

[13] *Id.*

15.     Defendant also assures its customers that it takes "multiple steps" to stay ahead of hackers. Specifically, Defendant states that "third-party security experts regularly conduct audits and assessments of our systems, ensuring we will never let our guard down. We encrypt all sensitive information, both when it is stored and when it is being transmitted, so that we make it difficult for potential hackers to gain access."[14]

16.     Despite recognizing its duty to do so, Defendant failed to implement reasonable safeguards or policies to protect Plaintiffs' and class members PII/PHI and waited nearly two months to disclose the Data Breach publicly.

### *The Data Breach*

17.     On or about October 6, 2023, Defendant posted a notice to its website concerning the Data Breach ("Notice"), which states as follows:

> We recently learned that certain 23andMe customer profile information that they opted into sharing through our DNA Relatives feature, was compiled from individual 23andMe.com accounts without the account users' authorization.

> After learning of suspicious activity, we immediately began an investigation.  While we are continuing to investigate this matter, we believe threat actors were able to access certain accounts in instances where users recycled login credentials – that is, usernames and passwords that were used on 23andMe.com were the same as those used on other websites that have been previously hacked.

> We believe that the threat actor may have then, in violation of our Terms of Service, accessed 23andMe.com accounts without authorization and obtained information from certain accounts, including information about users' DNA Relatives profiles, to the extent a user opted into that service.[15]

18.     On October 9, 2023, Defendant updated its post to state:

---

[14] *Id.*

[15] https://blog.23andme.com/articles/addressing-data-security-concerns (last visited December 29, 2023).

CLASS ACTION COMPLAINT

We are reaching out to our customers to provide an update on the investigation and to encourage them to take additional actions to keep their account and password secure. Out of caution, we are requiring that all customers reset their passwords and are encouraging the use of multi-factor authentication (MFA).

If we learn that a customer's data has been accessed without their authorization, we will notify them directly with more information.[16]

19.    On October 20, 2023, Defendant updated its again to note that: "As part of the ongoing security investigation, we have temporarily disabled some features within the DNA Relatives tool as an additional precaution to protect the privacy of our customers."[17]

20.    On November 6, 2023, Defendant acknowledged that it was implementing industry-standard security measures like two-factor authentication that should have been in place years earlier: "Starting today, we are requiring all customers to utilize email 2-step verification (2SV) as an added layer of protection for their account. New customers will be automatically enrolled in email 2SV when they create their account. Existing customers who do not already use an authenticator app will also be automatically enrolled in email 2SV, and will receive an email containing their verification code at their next sign-in."[18]

21.    On December 1, 2023, Defendant disclosed that its investigation had been completed: "23andMe has completed its investigation, assisted by third-party forensics experts. We are in the process of notifying affected customers, as required by law.  We have taken steps to further protect customer data, including requiring all existing customers to reset their password and requiring two-step verification for all new and

---

[16] *Id.*

[17] *Id.*

[18] *Id.*

existing customers. The company will continue to invest in protecting our systems and data.[19]

22.    In its December 5, 2023 update, Defendant identified the specific data elements potentially available through the DNA Relatives profiles, including DNA Relatives display name, recent account login, relationship labels (masculine, feminine, neutral), relationship and percentages of DNA shared with matches, ancestry reports and matching DNA segments, location, ancestor birth locations and family names, profile pictures, birth years, link to Family Tree, and anything added to "Introduce yourself!" section.[20]

23.    Instead of taking responsibility for the Data Breach, Defendant blamed its customers, claiming that "threat actors were able to access certain accounts in instances where users recycled login credentials – that is, usernames and passwords that were used on 23andMe.com were the same as those used on other websites that have been previously hacked."[21]

24.    But Defendant bears direct responsibility for the Data Breach. Unlike virtually every other company housing sensitive data from online accounts, Defendant did not require basic, industry-standard measures to protect the security of users' accounts. For example, two-factor (or dual factor) authentication is a common, industry-standard security feature in which the user provides two different authentication factors to verify themselves to better protect the user's credentials. Two-factor authentication provides higher security than single-factor authentication, in which a user can provide only a password to access an account. Despite housing some

---

[19] *Id.*

[20] https://customercare.23andme.com/hc/en-us/articles/212170838?_gl=1*1423h02*_ga*MTM5NzYyNjMxMC4xNzAxOTY0Nzgw*_ga_G330GF3ZFF*MTcwMzAwMjIxMy4yMS4xLjE3MDMwMDI1NDEuMC4wLjA (last visited December 29, 2023).

[21] https://blog.23andme.com/articles/addressing-data-security-concerns (last visited December 29, 2023).

of the most sensitive information imaginable, Defendant did not require two-factor authentication or even prompt users to enable it.

25.    Additionally, Defendant did not have security protocols in place to notify users when someone logs into their account from a new device or an unrecognized IP address. Whereas most companies request confirmation from the accountholder before allowing a suspicious sign-in to occur, Defendant let it happen with no questions asked.

26.    Defendant also offered no protection against repeated, automated attempts to login to its services. It is well known across the security industry that hackers can use software to rapidly check whether email and password combinations will grant access to a Defendant account. Hackers typically use lists of already compromised combinations from other services. Standard security measures would include a procedure for preventing someone from using software to rapidly check these account combinations after too many incorrect requests to login, by, for example, temporarily blocking access; marking their IP address as suspicious; or presenting a captcha check to ensure that the user is a human rather than an automated program. But Defendant did not offer these standard measures.

27.    On information and belief, Defendant offered inadequate protection against repeated attempts to try new password combinations with known email addresses, sometimes called "brute force entry." It is well known that hackers can use bots or other software to rapidly enter combinations of letters, numbers, and symbols into the password field, essentially guessing at an endless string of attempted passwords. Most online accounts will lockout a user after three to five incorrect password attempts. But Defendant allowed hackers (and hacker software) to try as many passwords as they want without locking them out.

28.    This is in stark contrast to the protections used by other internet-based companies, even those not in the business of security. For example, social media companies like Twitter, Facebook, and Instagram, email providers like Yahoo! and Gmail, and even streaming services such as Netflix notify accountholders when they

detect a suspicious login attempt, or any login attempt, from a new browser, location, or device.

29.     Defendant claims that customers' "privacy comes first," yet it waited until after the Data Breach to require industry-standard data security safeguards such as requiring password resets, two-step verification, and requiring the use of multi-factor authentication. Had Defendant implemented these commonsense security measures, hackers never could have accessed millions of individuals' data, and the Data Breach would have been prevented or much smaller in scope.

### The Data Breach was Preventable

30.     Following the Data Breach, Defendant represented in an 8-K filing that "on October 10, 2023, 23andMe required all users to reset their passwords, and on November 6, 2023, 23andMe required all new and existing users to login into the 23andMe website using two-step verification going forward."[22] It offered no explanation as to why it enabled this industry-standard login process only after the Data Breach occurred.

31.     Had Defendant implemented industry-standard safeguards to monitor, assess, and update security controls and related system risks, it would have been able to identify and eliminate successful intrusion long before the Data Breach occurred. Defendant could have also required multi-factor-authentication for all accounts logging into shared pools of sensitive information, such as under the Family Tree feature, so a single compromised account would be much less likely to result in a mass breach. Defendant's implementation of enhanced security measures only after the Data Breach is inexcusable given its knowledge that the healthcare industry is one of the most targeted sectors of cyberattacks.

---

[22] https://investors.23andme.com/node/9131/html (last visited December 29, 2023).

32.     Healthcare organizations, including the biotech sector, are prime targets for cyberattacks because of the information they collect and store, including financial information of patients, login credentials, insurance information, medical records and diagnoses, genetic code information, and personal information of employees, customers, and patients are all extremely valuable in underground markets.

33.     Healthcare cyberthreats "account for 24.5% of all hacks — more than for any other sector — with each breach costing an average of $5 million. And in healthcare, the biotech sector may be the weakest link of all."[23]

34.     Defendant was always fully aware of its obligation to protect its customers' PII/PHI and the risks associated with failing to do so. Defendant observed frequent public announcements of data breaches affecting health and biotech industries and knew that the information of the type collected, maintained, and stored by Defendant is highly coveted and a frequent target of hackers.

35.     For example, a report by the HIPAA Journal noted that "Between 2009 and 2022, 5,150 healthcare data breaches of 500 or more records have been reported to the HHS' Office for Civil Rights. Those breaches have resulted in the exposure or impermissible disclosure of 382,262,109 healthcare records. That equates to more than 1.2X the population of the United States. In 2018, healthcare data breaches of 500 or more records were being reported at a rate of around 1 per day. Fast forward 5 years and the rate has more than doubled. In 2022, an average of 1.94 healthcare data breaches of 500 or more records were reported each day."[24]

---

[23] https://www.nature.com/articles/s41587-022-01446-4 (last visited December 29, 2023).

[24] https://www.hipaajournal.com/healthcare-data-breach-statistics/ (last visited December 29, 2023).



36.    Moreover, the risk of the Data Breach was eminently foreseeable to Defendant. In its Form 10-K filing, Defendant specifically acknowledged and warned of the risk of a data breach that could compromise PII and PHI:

> Increased global IT security threats and more sophisticated and targeted computer crime pose a risk to the security of our systems and networks and the confidentiality, availability, and integrity of our data. There have been several recent, highly publicized cases in which organizations of various types and sizes have reported the unauthorized disclosure of customer or other confidential information, as well as cyberattacks involving the dissemination, theft, and destruction of corporate information, intellectual property, cash, or other valuable assets. There have also been several highly publicized cases in which hackers have requested "ransom" payments in exchange for not disclosing customer or other confidential information or for not disabling the target company's computer or other systems. A security breach or privacy violation that leads to disclosure or unauthorized use or modification of, or that prevents access to or otherwise impacts the confidentiality, security, or integrity of, sensitive, confidential, or proprietary information we or our third-party service providers maintain or otherwise process, could compel us to comply with breach notification laws, and cause us to incur significant costs for remediation, fines, penalties, notification to individuals and governmental authorities, implementation of measures intended to repair or replace systems or technology, and to prevent future occurrences, potential increases in insurance premiums, and forensic security audits or investigations. Additionally, a security compromise of our information systems or of those of businesses with whom we interact that results in

-13-

confidential information being accessed by unauthorized or improper persons could harm our reputation and expose us to customer and patient attrition, and claims brought by our customers, patients, or others for breaching contractual confidentiality and security provisions or data protection laws. Monetary damages imposed on us could be significant and not covered by our liability insurance.[25]

28.     Defendant acknowledged that its customers, including Plaintiffs and class members, considered it material that Defendant implemented and maintained reasonable data security measures adequate to protect PII/PHI, stating that "[e]ven the *perception* that the privacy of personal information is not satisfactorily protected or does not meet regulatory requirements could inhibit sales of our solutions. . . ." (emphasis added).[26]

29.     Defendant admits that it is subject to data protection laws including "the California Consumer Privacy Act, as amended by the California Privacy Rights Act (collectively, the "CCPA"), the California Genetic Information Privacy Act ("GIPA"), California Confidentiality of Medical Information Act ("CMIA"), Section 5 of the Federal Trade Commission Act ("FTC Act"), the Telephone Consumer Protection Act of 1991 ("TCPA") and, in the event of a data breach, various data breach laws across the 50 states and territories."[27]

30.     At all times relevant, Defendant knew, or reasonably should have known, of the importance of safeguarding PII/PHI and the foreseeable consequences that would occur if its data security systems were breached, including, specifically, the significant costs that would be imposed on affected individuals as a result of the breach.

31.     Despite all the publicly available knowledge of the serious threat of compromises of PII/PHI and despite holding the PII/PHI of millions of individuals,

---

[25] https://investors.23andme.com/static-files/536ba9a7-8a85-4b73-8b09-8215451089a0 (last visited December 29, 2023).

[26] *Id.*

[27] *Id.*

Defendant failed to use reasonable care in maintaining and overseeing the privacy and security of Plaintiffs' and class members' PII/PHI. Had Defendant implemented common sense security measures, cybercriminals never could have accessed millions of individuals' files, and the Data Breach would have been prevented or much smaller in scope.

### *Allegations Relating to Plaintiffs*

32.     Plaintiff Claire Paddy purchased a 23andMe DNA kit in early 2018. Soon thereafter, she provided a sample of her genetic material to Defendant for testing. Plaintiff Paddy was required to provide her PII/PHI, including her genetic material, to Defendant in order to receive genetic testing services. At the time of the Data Breach, Plaintiff Paddy's PII/PHI was maintained on Defendant's computer systems.

33.     In or about August 2014, Plaintiff Neil Haven received his 23andMe DNA kit from Defendant as consideration for participating in an Inflammatory Bowel Disease (IBD) study conducted by Defendant and Pfizer Inc. To participate in the study, Plaintiff Haven was required to provide a sample of his genetic material to Defendant for testing. He was also required to complete an initial 15-minute online survey about his experience with IBD. The survey included questions about his "diagnosis, treatment, symptoms, medications and family history."[28] Moreover, as a research participant, Plaintiff Haven received 23andMe's Personal Genome Service where he was given access to personalized reports on his health, traits, and ancestry via a 23andMe customer account. At the time of the Data Breach, Plaintiff Haven's PII/PHI was maintained on Defendant's computer systems.

34.     In exchange for his participation in this program, Plaintiff Haven was promised that "23andMe may share only your de-identified, individual-level data with qualified research partners. We built all of our systems to maximize protections of individual level data and we have a number of safeguards in place to ensure

---

[28] https://www.23andme.com/ibd/#faq (last visited December 29, 2023).

confidentiality. All data in the research computing environment are disconnected from your contact or identifying information and are coded with a unique research ID. 23andMe research scientists who have access to your sensitive data (i.e. DNA results, survey responses) do not have access to your account or contact information. Conversely, 23andMe project managers who have access to your contact information do not have access to your sensitive individual-level data. Thus, it would be extremely difficult for 23andMe employees or any external party to link your individually identifying information to your DNA results and survey response data."[29]

35.     On October 11, 2023 and October 12, 2023, Defendant provided notice of the Data Breach to Plaintiffs Paddy and Haven, respectfully, via email stating that it "recently learned that certain profile information – which a customer creates and chooses to share with their genetic relatives in the DNA Relatives feature – was accessed from individual 23andMe.com accounts. This was done without the account users' authorization. We do not have any indication at this time that there has been a data security incident within our systems, or that 23andMe was the source of the account credentials used in these attacks. While our investigation is ongoing, at this time we believe the threat actor was able to access certain accounts in instances where users employed identical login credentials - that is, usernames and passwords that were used on 23andMe.com were the same as those used on other websites that had been previously compromised or otherwise available."

36.     Defendant further stated that "If we learn that your data has been accessed without your authorization, we will contact you separately with more information."[30]

37.     In October 2023, Defendant provided a supplemental notice to Plaintiffs Paddy and Haven, respectfully, that stated in part: "After further review, we have identified your DNA Relatives profile as one that was impacted in this incident.

---

[29] https://www.23andme.com/ibd/#faq.

[30] *Id.*

Specifically, there was unauthorized access to one or more 23andMe accounts that were connected to you through DNA Relatives. As a result, the DNA Relatives profile information you provided in this feature was exposed to the threat actor."[31]

38.    The notice encouraged Plaintiffs to "make sure [their] 23andMe password is not used for other accounts" and to "[e]nable multi-factor authentication (MFA) on your 23andMe account."[32]

39.    As a result of the Data Breach, Plaintiffs have spent time and effort researching the breach. Plaintiffs have also suffered emotional distress knowing that their highly sensitive information is no longer confidential and can be used for blackmail, extortion, hate crimes, identity theft or fraud, and any number of additional harms against them for the rest of their lives. For example, Plaintiff Paddy is of Ashkenazi Jewish ancestry and is concerned she may be targeted by bad actors because of her ethnicity.

40.    Plaintiffs would not have purchased a 23andMe testing kit or provided their PII/PHI to Defendant had they known that Defendant had failed to implement and maintain reasonable security measures adequate to secure their PII/PHI.

41.    To add insult to injury, on December 5, 2023, Plaintiff Paddy received an email from Defendant informing her that "On November 30, 2023, [it] launched updates to its Terms of Service." The email further states "Important updates were made to the Dispute Resolution and Arbitration section to include procedures that will encourage a prompt resolution of any disputes and to streamline arbitration proceedings where multiple similar claims are filed. These updates will go into effect for customers 30 days from the date this email is received. We encourage you to read the new terms in full. Please notify us [via email] within 30 days of receiving this email if you do not agree to the terms, in which case you will remain subject to the current Terms of

---

[31] *Id.*

[32] *Id.*

Service. If you do not notify us within 30 days, you will be deemed to have agreed to the new terms."

42.    The new terms include, among other things, a binding arbitration clause, a class and collective action waiver clause, and a one (1) year statute of limitations clause.[33] Defendant, having already failed to safeguard its customers sensitive PII/PHI, it is now trying to prohibit Data Breach victims from talking part in a class action lawsuit or jury trial to seek redress for their injuries. Plaintiffs have opted out of these clauses while maintaining they are unenforceable in the first instance.

43.    As a direct and proximate result of Defendant's conduct, Plaintiffs have lost the ability to control the use of their PII/PHI.

44.    Defendant continues to store Plaintiffs' PII/PHI on its internal systems. Thus, Plaintiffs have a continuing interest in ensuring that their PII/PHI is protected and safeguarded from further breaches.

### *23andMe failed to Comply with FTC Guidelines*

36.    Federal agencies have issued recommendations and guidelines to help minimize the risks of a data breach for businesses holding sensitive data. For example, the Federal Trade Commission ("FTC") has issued numerous guides for business highlighting the importance of reasonable data security practices, which should be factored into all business-related decision making.[34]

37.    The FTC's publication *Protecting Personal Information: A Guide for Business* sets forth fundamental data security principles and practices for businesses to implement and follow as a means to protect sensitive data.[35] Among other things, the

---

[33] https://www.23andme.com/legal/terms-of-service/?utm_source=23andme&utm_medium=email&utm_campaign=notify_notification&utm_content=n_2839436789#dispute-resolution-arbitration  (last visited December 29, 2023).

[34] https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited December 29, 2023).

[35] https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited December 29, 2023).

guidelines note that businesses should protect the personal customer information that they collect and store; properly dispose of personal information that is no longer needed; encrypt information stored on their computer networks; understand their network's vulnerabilities; and implement policies to correct security problems. The guidelines also recommend that businesses use an intrusion detection system, monitor all incoming traffic for unusual activity, monitor for large amounts of data being transmitted from their system, and have a response plan ready in the event of a breach.[36]

38.     Additionally, the FTC recommends that companies limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

39.     The FTC has brought enforcement actions against businesses for failing to reasonably protect customer information, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.[37]

40.     Defendant was fully aware of its obligation to implement and use reasonable measures to protect the PII/PHI of its customers but failed to comply with these basic recommendations and guidelines that would have prevented this breach from occurring. Defendant's failure to employ reasonable measures to protect against unauthorized access to patient information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

---

[36] *Id.*

[37] https://www.ftc.gov/news-events/topics/protecting-consumer-privacy-security/privacy-security-enforcement (last visited December 29, 2023).

1

***The Impact of the Data Breach on Victims***

2    41.    Plaintiffs' and class members' highly sensitive PII/PHI is of great value

3   to cybercriminals, who can use the data stolen in the Data Breach to exploit Plaintiffs

4   and the class members and profit off their misfortune and stolen information. The

5   cybercriminals' motives for the Data Breach were purely nefarious and malicious in

6   nature: their one goal was to access systems, including Defendant's systems, in order

7   to obtain valuable PII/ PHI to sell on the dark web. Indeed, hackers likely have been

8   selling Defendants customers' PII/PHI on the dark web since at least August 2023.

9    42.    The value of the PII/PHI the Defendant collects is extremely high and

10   irreplaceable. Defendant understands this high value as it proclaims that the insights

11   gained from analyzing customers' genotypic data together with phenotypic data

12   concerning their health, physical characteristics, family origins, lifestyle, and other

13   habits "may highlight opportunities to develop a drug to treat or cure specific

14   diseases."[38]

15    43.    But for individuals discovering a predisposition to certain diseases can

16   cause psychological distress and lead to significant mental health impacts, even more

17   so if this highly private information is leaked and made public. Utilizing a practice

18   known as social engineering, there is potential for malicious actors to use leaked

19   genetic data to manipulate individuals or groups based on their genetic characteristics.

20    44.    There is also a risk that the stolen PII/PHI data can be used for purposes

21   such as targeted advertising based on genetic traits, or even more nefarious purposes

22   by actors promoting racist or discriminatory practices like eugenics. Employers or

23   insurance companies could use this information to discriminate against individuals

24   based on their genetic predispositions to certain diseases or conditions. Furthermore,

25   genetic data does not just reveal information about the individual but also their

26

27

28   [38] https://investors.23andme.com/node/8601/html (last visited on December 29, 2023).

relatives. Thus, the Data Breach may impact not just the direct user but also their entire family tree.

41.    Because genetic data is immutable, unlike a password or credit card number, the repercussions are long-lasting. For example, while credit card information and PII can sell for as little as $1-$2 on the black market, PHI can sell for hundreds or thousands of dollars. This is because "one's personal health history, including ailments, illnesses, surgeries, etc., can't be changed, unlike credit card information or Social Security Numbers."[39]

42.    The information compromised in the Data Breach—including genetic information which is the "most sensitive and irreplaceable information about individuals"[40]—is much more valuable than the loss of credit card information in a retailer data breach. There, victims can simply close their credit and debit card accounts and potentially even rely on automatic fraud protection offered by their banks. Here, however, the information compromised is much more difficult, if not impossible, for consumers to re-secure after being stolen because it goes to the core of their identity.

43.    Critically, government reports have indicated that the data breach has resulted in the targeted exfiltration and sale on the black market of at least one million data profiles pertaining to individuals with Ashkenazi Jewish heritage, including Plaintiff Paddy. Indeed, many 23andMe customers, including Plaintiff Paddy, now live in fear because of traumatic histories of being targeted and attacked based on ethnicity. This is a particularly dangerous time for such information to be released considering the rise in antisemitic threats and the war in Israel. The combination of genetic heritage data and personal information could allow bad actors to target Defendant's customers

---

[39] https://www.cisecurity.org/insights/blog/data-breaches-in-the-healthcare-sector (last visited on December 29, 2023).

[40] https://portal.ct.gov/-/media/AG/Press_Releases/2023/10-30-2023-William-Tong--23andMe-Inc-Inquiry-Letter-final-002.pdf (last visited on December 29, 2023).

based on ethnic or religious backgrounds putting them at serious risk of harassment, stalking, or even acts of violence.

44.     As the result of the wide variety of injuries that can be traced to the Data Breach, Plaintiffs and class members have and will continue to suffer economic loss and other actual harm for which they are entitled to damages, including, but not limited to, the following:

   a.  the unconsented disclosure of confidential information to a third party;

   b.  losing the value of the explicit and implicit promises of data security;

   c.  identity theft and fraud resulting from the theft of their PII and PHI;

   d.  costs associated with the detection and prevention of identity theft and unauthorized use of their financial accounts;

   e.  the costs of credit and other monitoring services indefinitely;

   f.  anxiety, emotional distress, and loss of privacy;

   g.  unauthorized charges and loss of use of and access to their financial and investment account funds and costs associated with inability to obtain money from their accounts or being limited in the amount of money they were permitted to obtain from their accounts, including missed payments on bills and loans, late charges and fees, and adverse effects on credit;

   h.  costs associated with time spent and the loss of productivity or the enjoyment of one's life from taking time to address and attempt to mitigate and address the actual and future consequences of the Data Breach, including searching for fraudulent activity and the stress, nuisance, and annoyance of dealing with the repercussions of the Data Breach; and

   i.  the continued, imminent, and certainly impending injury flowing from potential fraud and identify theft posed by their PII and PHI being in the possession of one or many malicious actors.

45.     Even in instances where an individual is reimbursed for a financial loss due to identity theft or fraud, that does not make that individual whole again as there is typically significant time and effort associated with seeking reimbursement.

46.     Victims of data breaches are much more likely to become victims of identity fraud than those who have not. Data Breach victims who do experience identity theft often spend hundreds of hours fixing the damage caused by identity thieves.[41] Additionally, the U.S. Department of Justice's Bureau of Justice Statistics has reported that, even if data thieves have not caused financial harm, data breach victims "reported spending an average of about 7 hours clearing up the issues."[42]

47.     Data breaches involving medical records are not only incredibly costly, they can "also [be] more difficult to detect, taking almost twice as long as normal identity theft."[43] The FTC warns that a thief may use private medical information to, among other things, "see a doctor, get prescription drugs, buy medical devices, submit claims with your insurance provider, or get other medical care"[44] and that this may have far reaching consequences for a victim's ability to access medical care and use insurance benefits.

48.     Plaintiffs and class members place significant value in data security. According to a survey conducted by cyber-security company FireEye Mandiant, approximately 50% of consumers consider data security to be a main or important consideration when making purchasing decisions and nearly the same percentage would be willing to pay more in order to work with a provider that has better data

---

[41] https://www.marylandattorneygeneral.gov/ID%20Theft%20Documents/Identitytheft.pdf (last accessed December 29, 2023)

[42] https://bjs.ojp.gov/content/pub/pdf/vit14.pdf (last accessed December 29, 2023)

[43] https://www.consumer.ftc.gov/articles/what-know-about-medical-identity-theft (last visited December 29, 2023).

[44] *Id.*

security. Likewise, 70% of consumers would provide less personal information to organizations that suffered a data breach.

49.      Because of the value consumers place on data privacy and security, companies with robust data security practices are viewed more favorably by potential users and can command higher prices than those who do not. Consequently, had 23andMe's customers known the truth about its data security practices—that the company did not implement industry-standard measures to protect their PII and PHI— they would not have used 23andMe's services or would have paid significantly less. As such, Plaintiffs and class members did not receive the benefit of their bargain with 23andMe because they paid for the value of services they did not receive.

50.      Plaintiffs and class members have a direct interest in Defendant's promises and duties to protect their PII and PHI, *i.e.*, that Defendant not increase their risk of identity theft and fraud. Because Defendant failed to live up to its promises and duties in this respect, Plaintiffs and class members seek the present value of identity protection services to compensate them for the present harm and present and continuing increased risk of harm caused by Broward Health's wrongful conduct. Through this remedy, Plaintiffs and class members seek to restore herself and class members as close to the same position as they would have occupied but for Defendant's wrongful conduct, namely its failure to adequately protect Plaintiffs' and class members' PII and PHI.

51.      Plaintiffs and class members further seek to recover the value of the unauthorized access to their PII and PHI permitted through Broward Health's wrongful conduct. This measure of damages is analogous to the remedies for unauthorized use of intellectual property. Like a technology covered by a trade secret or patent, use or access to a person's PII or PHI is non-rivalrous—the unauthorized use by another does not diminish the rights-holder's ability to practice the patented invention or use the trade-secret protected technology. Nevertheless, a plaintiff may generally recover the reasonable use value of the IP—i.e., a "reasonable royalty" from an infringer. This is

true even though the infringer's use did not interfere with the owner's own use (as in the case of a non-practicing patentee) and even though the owner would not have otherwise licensed such IP to the infringer. A similar royalty or license measure of damages is appropriate here under common law damages principles authorizing recovery of rental or use value. This measure is appropriate because (a) Plaintiffs and class members have a protectible property interest in their PII and PHI; (b) the minimum damages measure for the unauthorized use of personal property is its rental value; and (c) rental value is established with reference to market value, *i.e.*, evidence regarding the value of similar transactions.

## CLASS ACTION ALLEGATIONS

46.     Plaintiffs seek relief individually and as representatives of all others who are similarly situated. Pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), (b)(3) and/or (c)(4), Plaintiffs seek certification of a nationwide class defined as: All persons whose PII and PHI was compromised as a result of the Data Breach announced by Defendant in or about October 2023 (the "Class").

47.     Specifically excluded from the Class are Defendant; its officers, directors, or employees; any entity in which Defendant has a controlling interest; and any affiliate, legal representative, heir, or assign of Defendant. Also excluded from the Class are any federal, state, or local governmental entities, any judicial officer presiding over this action and the members of their immediate family and judicial staff, and any juror assigned to this action.

48.     <u>Class Identity</u>: The members of the Class are readily identifiable and ascertainable. Defendant and/or its affiliates, among others, possess the information to identify and contact class members.

49.     <u>Numerosity</u>: The Class contains millions of individuals and is so numerous that joinder of all of them is impracticable.

50.   <u>Typicality</u>: Plaintiffs' claims are typical of the claims of the members of the classes because all class members had their PII/PHI compromised in the Data Breach and were harmed as a result.

51.   <u>Adequacy</u>: Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs have no interest antagonistic to those of the Class and are aligned with class members' interests because Plaintiffs were subject to the same Data Breach and experienced the same injuries and harms. Plaintiffs have also retained competent counsel with significant experience litigating complex class actions, including many significant cases involving data breaches.

52.   <u>Commonality and Predominance</u>: There are questions of law and fact common to the classes. These common questions predominate over any questions affecting only individual class members. The common questions of law and fact include, without limitation:

    a.  Whether Defendant violated statutes including the UCL;

    b.  Whether Defendant owed Plaintiffs and class members a duty to implement and maintain reasonable security procedures and practices to protect their PII/PHI;

    c.  Whether Defendant breached an express or implied contract with Plaintiffs and class members, including whether Defendant breached an agreement with Plaintiffs and class members to keep their PII/PHI confidential;

    d.  Whether Defendant received a benefit without proper restitution making it unjust for Defendant to retain the benefit without commensurate compensation;

    e.  Whether Defendant acted negligently in connection with the monitoring and/or protection of Plaintiffs' and class members' PII/PHI;

    f.  Whether Defendant breached its duty to implement reasonable security systems to protect Plaintiffs' and class members' PII/PHI;

g.  Whether Defendant's breach of its duty to implement reasonable security systems directly and/or proximately caused damages to Plaintiffs and class members;

h.  Whether Defendant adequately addressed and fixed the vulnerabilities that enabled the Data Breach;

i.  Whether Defendant provided timely notice of the Data Breach to Plaintiffs and class members; and,

j.  Whether Plaintiffs and class members are entitled to compensatory damages, punitive damages, and/or statutory or civil penalties as a result of the Data Breach.

53.  Defendant has engaged in a common course of conduct and class members have been similarly impacted by Defendant's failure to maintain reasonable security procedures and practices to protect customers' PII/PHI, as well as Defendant's failure to timely alert affected customers to the Data Breach.

54.  <u>Superiority</u>: A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most if not all class members would find the cost of litigating their individual claims prohibitively high and have no effective remedy. The prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members and risk inconsistent treatment of claims arising from the same set of facts and occurrences. Plaintiffs know of no difficulty likely to be encountered in the maintenance of this action as a class action under Federal Rule of Civil Procedure 23.

# CLAIMS FOR RELIEF

## COUNT I

### Negligence
#### *(On Behalf of Plaintiffs and the Class)*

55.  Plaintiffs repeat and reallege every allegation set forth in the preceding paragraphs.

56.     Defendant required Plaintiffs and class members to provide their PII/PHI as a condition of receiving genetic testing services. Defendant collected and stored the data for purposes of providing said services as well as for commercial gain.

57.     Defendant owed Plaintiffs and class members a duty to exercise reasonable care in protecting their PII/PHI from unauthorized disclosure or access. Defendant acknowledged this duty in its "Privacy Statement," "Privacy Notice for U.S. State Residents," and on the "Privacy" page on its website, where it promised not to disclose Plaintiffs' and class members' PII/PHI without their consent.

58.     Defendant owed a duty of care to Plaintiffs and class members to provide security, consistent with industry standards, to ensure that Defendant's systems and networks adequately protected the PII/PHI.

59.     As a provider of genetic testing services, Defendant had a special relationship with Plaintiffs and class members who entrusted Defendant to adequately their confidential personal, financial, medical and genetic information.

60.     Defendant's duty to use reasonable care in protecting PII/PHI arose as a result of the parties' relationship, as well as common law and federal law, including the FTC Act and Defendant's own policies and promises regarding privacy and data security.

61.     Defendant knew, or should have known, of the risks inherent in collecting and storing PII/PHI and the importance of implementing industry-standard security measures to prevent or detect unauthorized access to user accounts. Defendant knew or should have known that it faced an increased threat of customer data theft, as judged by the many data breaches targeted at companies that store PII/PHI in recent years.

62.     Defendant breached its duty to Plaintiffs and class members by failing to exercise reasonable care in safeguarding and protecting Plaintiffs' and class members' PII/PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures,

protocols, and software and hardware systems to safeguard and protect PII/PHI entrusted to it, including Plaintiffs' and class members' PII/PHI.

63.     Plaintiffs and class members' PII/PHI would not have been compromised but for Defendant's wrongful and negligent breach of their duties.

64.     Defendant's failure to take proper security measures to protect the sensitive PII/PHI of Plaintiffs and class members as described in this Complaint, created conditions conducive to a foreseeable, intentional criminal act, namely the unauthorized access and exfiltration of PII/PHI by unauthorized third parties. Given the increased threat of customer data theft in healthcare organizations and extremely high value of genetic information, Plaintiffs and class members are part of a foreseeable, discernible group that was at high risk of having their PII/PHI misused or disclosed if not adequately protected by Defendant.

65.     It was also foreseeable that Defendant's failure to provide timely and forthright notice of the Data Breach would result in injury to Plaintiffs and class members.

66.     As a direct and proximate result of Defendant's conduct, Plaintiffs and class members have and will suffer damages including: (i) a substantially increased and imminent risk of identity theft—risk justifying or necessitating expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII/PHI; (iii) breach of the confidentiality of their PII/PHI; (iv) damages for the unconsented disclosure of their PII/PHI, for which there is a well-established market; (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risk of identity theft they face and will continue to face; and (vi) overpayment for the services that were received without adequate data security.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## COUNT II

### Negligence *Per Se*
### (On Behalf of Plaintiffs and the Class)

67.    Plaintiffs repeat and reallege every allegation set forth in the preceding paragraphs.

68.    Defendant's duties arise from Section 5 of the Federal Trae Commission Act ("FTC Act"), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect PII. 15 U.S.C. § 45(a)(1). The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.

69.    Defendant's duties also arose from California's Genetic Information Privacy Act, Cal. Civ. Code §§ 56.18 *et seq*. ("CGIPA"), which requires direct-to-consumer genetic testing companies such as 23andMe to, among other things, "[i]mplement and maintain reasonable security procedures and practices to protect a consumer's genetic data against unauthorized access, destruction, use, modification, or disclosure." Cal. Civ. Code § 56.18(d)(1).

70.    Defendant violated Section 5 of the FTC Act and CGIPA by failing to use reasonable measures to protect PII/PHI and failing to comply with applicable industry standards. Defendant's conduct was unreasonable given the nature and amount of PII/PHI it obtained, stored, and disseminated in the regular course of its business, and the foreseeable consequences of a data breach, including, specifically, the significant damage that would result to Plaintiffs and class members.

71.    Defendant's violations of Section 5 of the FTC Act and the CGIPA constitute negligence *per se*.

72.    Plaintiffs and class members are within the class of persons that the FTC Act and the CGIPA were intended to protect.

73.     The harm that occurred as a result of the Data Breach is the type of harm the FTC Act and the CGIPA were intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and class members. Likewise, the CGIPA is specifically intended to "safeguard the privacy, confidentiality, security, and integrity" of the genetic information of customers of direct-to-consumers genetic testing companies.

74.     As a direct and proximate result of Defendant's negligence *per se*, Plaintiffs and class members have suffered, continue to suffer, and will suffer, injuries, damages, and harm as alleged herein.

**<u>COUNT III</u>**

**Violation of California's Unfair Competition Law ("UCL")**
**Cal. Bus. Prof. Code § 17200, *et seq*.**
***(On Behalf of Plaintiffs and the Class)***

75.     Plaintiffs repeat and reallege every allegation set forth in the preceding paragraphs.

76.     Defendant is a "person" as defined by Cal. Bus. & Prof. Code § 17201.

77.     The UCL prohibits any "unlawful," "fraudulent," or "unfair" business act or practice and any false or misleading advertising, as those terms are defined by the UCL and relevant case law. By virtue of the above-described wrongful actions, inaction, omissions, and want of ordinary care that directly and proximately caused the Data Breach, Defendant engaged in unlawful, unfair and fraudulent practices within the meaning, and in violation of, the UCL.

78.     In the course of conducting its business, 23andMe committed "unlawful" business practices by, *inter alia*, knowingly failing to design, adopt, implement, control, direct, oversee, manage, monitor and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to

safeguard and protect Plaintiffs' and class members' PII/PHI, and by violating the statutory and common law alleged herein, including, *inter alia*, the CCPA, Section 5 of the FTC Act, the CGIPA, and Article I, Section 1 of the California Constitution (California's constitutional right to privacy). Plaintiffs and class members reserve the right to allege other violations of law by 23andMe constituting other unlawful business acts or practices. Defendant's above-described wrongful actions, inaction, omissions, and want of ordinary care are ongoing and continue to this date.

79.    Defendant's above-described wrongful actions, inaction, omissions, want of ordinary care, misrepresentations, practices, and non-disclosures also constitute "unfair" business acts and practices in violation of the UCL in that Defendant's wrongful conduct is substantially injurious to consumers, offends legislatively-declared public policy, and is immoral, unethical, oppressive, and unscrupulous. Defendant's practices are also contrary to legislatively declared and public policies that seek to protect PII/PHI and ensure that entities who solicit or are entrusted with personal data utilize appropriate security measures, as reflected by laws such as the CCPA, Article I, Section 1 of the California Constitution (California's constitutional right to privacy), the CGIPA, and Section 5 of the FTC Act. The gravity of Defendant's wrongful conduct outweighs any alleged benefits attributable to such conduct. There were reasonably available alternatives to further Defendant's legitimate business interests other than engaging in the above-described wrongful conduct.

80.    The UCL also prohibits any "fraudulent business act or practice." Defendant's nondisclosures and misrepresentations regarding the security of Plaintiffs' and class members' PII/PHI and their inadequate data security were false, misleading, and likely to deceive the consuming public in violation of the UCL.

81.    Defendant's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendant's data security and ability to protect the confidentiality of patients' PII/PHI.

82.     As a direct and proximate result of Defendant's unfair, unlawful, and fraudulent acts and practices, Plaintiffs and class members were injured and lost money or property, the premiums and/or price received by Defendant for its goods and services, the loss of the benefit of their bargain with Defendant as they would not have paid Defendant for goods and services or would have paid less for such goods and services but for Defendant's violations alleged herein; substantially increased risk of identity theft; cost of associated protective and remedial services; breach of the confidentiality of their PII/PHI; damages for the unconsented disclosure of their PII/PHI; increased, imminent risk of fraud and identity theft; and overpayment for the services that were received without adequate data security.

83.     Defendant acted intentionally, knowingly, and maliciously to violate the UCL, and recklessly disregarded Plaintiffs' and class members' rights. Defendant knew or should have known that it faced an increased threat of customer data theft, as judged by the many data breaches that targeted companies.

84.     Plaintiffs and class members seek all monetary and non-monetary relief allowed by law, including restitution of all profits stemming from Defendant's unfair, unlawful, and fraudulent business practices or use of their PII/PHI; declaratory relief; reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5; injunctive relief; and other appropriate equitable relief.

## COUNT IV

### Breach of Implied Contract
### *(On Behalf of Plaintiffs and the Class)*

85.     Plaintiffs repeat and reallege every allegation set forth in the preceding paragraphs.

86.     Plaintiffs and class members were required to provide their PII/PHI to Defendant in order to receive genetic testing services.

87.     As part of these transactions, Defendant agreed to safeguard and protect the PII/PHI of Plaintiffs and class members. Implicit in these transactions between

Defendant and class members was the obligation that Defendant would use the PII/PHI for approved business purposes only and would not make unauthorized disclosures of the information or allow unauthorized access to the information.

88.     Additionally, Defendant implicitly promised to retain this PII/PHI only under conditions that kept such information secure and confidential and therefore had a duty to reasonably safeguard and protect the PII/PHI of Plaintiffs and class members from unauthorized disclosure or access.

89.     Plaintiffs and class members entered into implied contracts with the reasonable expectation that Defendant's data security practices and policies were reasonable and consistent with industry standards. Plaintiffs and class members believed that Defendant would use part of the monies paid to Defendant under the implied contracts to fund adequate and reasonable data security practices to protect their PII/PHI.

90.     Plaintiffs and class members would not have provided and entrusted their PII/PHI to Defendant or would have paid less for Defendant's services in the absence of the implied contract between them and Defendant. The safeguarding of Plaintiffs' and class members' PII/PHI was critical to realizing the intent of the parties.

91.     The nature of Defendant's implied promise itself—the subject matter of the contractual provision at issue—was to protect Plaintiffs' and class members' PII/PHI in order to prevent harm and prevent present and continuing increased risk.

92.     Defendant breached their implied contract with Plaintiffs and class members by failing to reasonably safeguard and protect Plaintiffs' and class members' PII/PHI, which was compromised as a result of the Data Breach.

93.     As a direct and proximate result of Defendant's breaches, Plaintiffs and class members sustained actual losses and damages as alleged herein, including that they did not receive the benefits of the bargains for which they paid. Plaintiffs and class members alternatively seek an award of nominal damages.

## COUNT V

### Unjust Enrichment
### *(On Behalf of Plaintiffs and the Class)*

94.     Plaintiffs repeat and reallege every allegation set forth in the preceding paragraphs.

95.     Plaintiffs and class members have an interest, both equitable and legal, in their PII/PHI that was conferred upon, collected by, and maintained by the Defendant and which was stolen in the Data Breach. This information has independent value.

96.     Plaintiffs and class members conferred a monetary benefit on Defendant in the form of payments for medical and healthcare services, including those paid indirectly by Plaintiffs and class members to Defendant.

97.     Defendant appreciated and had knowledge of the benefits conferred upon it by Plaintiffs and class members.

98.     The price for genetic testing services that Plaintiffs and class members paid to Defendant should have been used by Defendant, in part, to pay for the administrative costs of reasonable data privacy and security practices and procedures.

99.     Likewise, in exchange for receiving Plaintiffs' and class members' valuable PII/PHI, which Defendant was able to use for their own business purposes and which provided actual value to Defendant, Defendant was obligated to devote sufficient resources to reasonable data privacy and security practices and procedures.

100.     As a result of Defendant's conduct, Plaintiffs and class members suffered actual damages as described herein. Under principals of equity and good conscience, Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiffs and class members all unlawful or inequitable proceeds they received from Plaintiffs and class members, including damages equaling the difference in value between genetic testing services that included implementation of reasonable data privacy and security practices that Plaintiffs and class members paid for and the

services without reasonable data privacy and security practices that they actually received.

## COUNT VI

### Breach of Confidence
### *(On Behalf of Plaintiffs and the Class)*

101. Plaintiffs repeat and reallege every allegation set forth in the preceding paragraphs.

102. Defendant required Plaintiffs and class members to provide their PII/PHI as a condition of receiving genetic testing services. Such PII/PHI was confidential, highly personal and sensitive, and not generally known.

103. Defendant knew Plaintiffs' and class members' PII/PHI was being disclosed in confidence and understood the confidence was to be maintained, including by expressly and implicitly agreed to protect the confidentiality and security of the PII/PHI it collected, stored, and maintained.

104. There was disclosure of Plaintiffs' and class members' PII/PHI as a result of the Data Breach in violation of this understanding. The disclosure occurred because Defendant failed to implement and maintain reasonable safeguards to protect its customers' PII/PHI and failed to comply with industry-standard data security practices.

105. As a direct and proximate result of Defendant's breach of confidence, Plaintiffs and class members suffered injury and sustained actual losses and damages as alleged herein. Plaintiffs and class members alternatively seek an award of nominal damages.

## COUNT VII

### Declaratory Judgment
### *(On Behalf of Plaintiffs and the Class)*

106. Plaintiffs repeat and reallege every allegation set forth in the preceding paragraphs and assert this claim in the alternative to Plaintiffs' breach of implied contract claim.

107.   Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal statutes described in this Complaint.

108.   An actual controversy has arisen in the wake of the Data Breach regarding Defendant's present and prospective common law and other duties to reasonably safeguard PII/PHI and whether Defendant is currently maintaining data security measures adequate to protect Plaintiffs and class members from further cyberattacks and data breaches that could compromise their PII.

109.   Defendant still possesses PII/PHI pertaining to Plaintiffs and class members, which means their PII/PHI remains at risk of further breaches because Defendant's data security measures remain inadequate. Plaintiffs and class members continue to suffer injuries as a result of the compromise of their PII/PHI and remain at an imminent risk that additional compromises of their PII/PHI will occur in the future.

110.   Pursuant to the Declaratory Judgment Act, Plaintiffs seek a declaration that: (a) Defendant's existing data security measures do not comply with its obligations and duties of care; and (b) in order to comply with their obligations and duties of care, (1) Defendant must have policies and procedures in place to ensure the parties with whom it shares sensitive personal information maintain reasonable, industry-standard security measures, including, but not limited to, those listed at (ii), (a)-(i), *infra*, and must comply with those policies and procedures; (2) Defendant must: (i) purge, delete, or destroy in a reasonably secure manner Plaintiffs' and class members' PII/PHI if it is no longer necessary to perform essential business functions so that it is not subject to further theft; and (ii) implement and maintain reasonable, industry-standard security measures, including, but not limited to:

       a.  Engaging third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated

attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

b. Engaging third-party security auditors and internal personnel to run automated security monitoring;

c. Auditing, testing, and training its security personnel regarding any new or modified procedures;

d. Encrypting PII/PHI and segmenting PII/PHI by, among other things, creating firewalls and access controls so that if one area of Defendant's systems is compromised, hackers cannot gain access to other portions of its systems;

e. Purging, deleting, and destroying in a reasonable and secure manner PII/PHI not necessary to perform essential business functions;

f. Conducting regular database scanning and security checks;

g. Conducting regular employee education regarding best security practices;

h. Implementing multi-factor authentication and POLP to combat system-wide cyberattacks; and

i. Routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, respectfully request the following relief:

A. That the Court certify this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, appoint Plaintiffs as class representatives and Plaintiffs' counsel as Class Counsel;

B. That the Court grant permanent injunctive relief to prohibit and prevent Defendant from continuing to engage in the unlawful acts, omissions, and practices described herein;

C. That the Court award Plaintiffs and class members compensatory,

consequential, and general damages, including nominal damages as appropriate, for each count as allowed by law in an amount to be determined at trial;

D.   That the Court award statutory damages, trebled, and/or punitive or exemplary damages, to the extent permitted by law;

E.   That the Court order disgorgement and restitution of all earnings, profits, compensation, and benefits received by Defendant as a result of their unlawful acts, omissions, and practices;

F.   That Plaintiffs be granted the declaratory and injunctive relief sought herein;

G.   That the Court award to Plaintiffs the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses; and

H.   That the Court award pre-and post-judgment interest at the maximum legal rate and all such other relief as it deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a jury trial in the instant action.


Dated: December 29, 2023          Respectfully submitted,

/s/ *Laurence D. King*
Laurence D. King (SBN 206423)
Matthew B. George (SBN 239322)
Blair E. Reed (SBN 316791)
**KAPLAN FOX & KILSHEIMER LLP**
1999 Harrison Street, Suite 1560
Oakland, CA 94612
Telephone: 415-772-4700
Facsimile: 415-772-4707
lking@kaplanfox.com
mgeorge@kaplanfox.com
breed@kaplanfox.com

Norman E. Siegel (*pro hac vice* forthcoming)
J. Austin Moore (*pro hac vice* forthcoming)
Brandi S. Spates (*pro hac vice* forthcoming)
**STUEVE SIEGEL HANSON LLP**
460 Nichols Road, Suite 200
Kansas City, Missouri 64112

Tel: 816-714-7100
siegel@stuevesiegel.com
moore@stuevesiegel.com
spates@stuevesiegel.com

*Counsel for Plaintiffs and the Class*